## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

John E. Martin,  **CASE NO. 1:19-CV-2394**

**Plaintiff,**

-vs-  **JUDGE PAMELA A. BARKER**

Daniel J. Bennett, et al.,

**MEMORANDUM OF OPINION AND ORDER**

**Defendants.**

Currently pending is the Motion for Summary Judgment of Defendants Daniel Bennett, John Ball, and the Village of Roaming Shores, Ohio (hereinafter "the Village Defendants"), which was filed on May 4, 2021. (Doc. No. 48.) Plaintiff John E. Martin filed a brief in opposition on September 7, 2021, to which the Village Defendants replied on September 24, 2021. (Doc. Nos. 65, 68.) Also pending is Plaintiff's Motion for Default Judgment against Defendant William Badell. (Doc. No. 52.) No response was filed to this Motion.

For the following reasons, the Village Defendants' Motion for Summary Judgment (Doc. No. 48) is GRANTED as to Plaintiff's claims under 42 U.S.C. § 1983 and state law claim for civil conspiracy; and DENIED as to Plaintiff's state law claim for abuse of process against Defendant Bennett. Plaintiff's Motion for Default Judgment (Doc. No. 52) is DENIED and his claims against Defendant Badell under 42 U.S.C. § 1983 are DISMISSED. The remainder of the case is REMANDED to the Court of Common Pleas of Ashtabula County, Ohio, from which it was removed.

### I.  Background

#### A.  Factual Background

i.      **Plaintiff, Defendant Badell, and the Roaming Rock Shores Subdivision**

Plaintiff John E. Martin (hereinafter Plaintiff or "Martin") resides within the Roaming Rock Shores Subdivision (hereinafter "the Subdivision") in the Village of Roaming Shores, Ashtabula County, Ohio.   (Depo. of John E. Martin (Doc. No. 43-1) at Tr. 7, 12.)  The Subdivision is governed by a local homeowners' association known as RomeRock Association, Inc. (hereinafter "RRA" or "Association").  (*Id.* at Tr. 12.)  The RRA has enacted certain rules and regulations regarding, among other things, the maintenance and upkeep of property located within the Subdivision.  (*Id.* at Tr. 16-17.)  In addition, the RRA oversees the assessment of annual charges and dues for Subdivision property owners.  (*Id.* at Tr. 12, 21.)  The RRA has a governing Board of Directors.  (*Id.* at Tr. 12-15.)  Between 2013 to 2018, Martin was a Director of the RRA Board, as well as its Treasurer.  (*Id.* at Tr. 14-15.)

At all times relevant herein, Defendant Badell also resided within the Roaming Rock Shores Subdivision, approximately a quarter to a half mile away from Martin's residence.  (*Id.* at Tr. 7-8.)  The record reflects a history of problems between Badell and the RRA, largely stemming from Mr. Badell's alleged failure to properly maintain his property.  In June 2011, the RRA notified Badell that "the Board of Directors has voted to suspend your membership privileges effectively immediately for failure to correct the violations existing with respect to your property." (Doc. No. 48-1 at PageID# 1557.)  The RRA thereafter filed a lawsuit against Badell in the Court of Common Pleas of Ashtabula County in September 2012 seeking injunctive relief relating to these alleged violations.[1]  *See*

---

[1] The parties have not provided, and the Court does not have access to, the Complaint and other filings in the Association's state court lawsuit against Badell.  During his deposition, Martin described his understanding of the allegations in that dispute as follows: "[M]y understanding was there were several issues where [Badell], the state of his property, the amount

2

*RomeRock Association, Inc. v. Badell*, Ashtabula County Court of Common Pleas Case No. 2012 CV 0811. That lawsuit was dismissed without prejudice in November 2013, apparently as a result of a settlement between the RRA and Badell. *Id. See also* Martin Depo. (Doc. No. 43-1) at Tr. 17. Martin testified, however, that, even after the settlement, "people on the Board [were] still unhappy with Mr. Badell."[2] (Martin Depo. (Doc. No. 43-1) at Tr. 20.)

In addition, it is undisputed that there were frequent conflicts between Badell and his Subdivision neighbors. Specifically, the record contains Police Reports from the Village of Roaming Shores Police Department indicating that officers were called to address "neighbor disputes" between Badell and various neighbors on at least fifteen (15) occasions between 2010 and 2015. *See, e.g.,* Roaming Shores Police Reports Nos. 10-0399, 11-0072, 11-0191, 11-0357, 11-0358, 11-0382, 12-0116, 12-0216, 12-0232, 12-0407, 13-0085, 13-0123, 13-0184, 13-0203, 15-0095.[3] (Doc. No. 48-1

---

of material possessions displayed on his property, the fact that he was possibly running a business from his residence, those are the two that I understand were specifically named." (Martin Depo. (Doc. No. 43-1) at Tr. 17.)

[2] The Village of Roaming Shores also raised concerns regarding Badell's property during this time period. In July 2014, Village Administrator and Zoning Inspector Kevin Grippi wrote a letter to Badell advising him that he was in violation of Village Ordinances due to having "11 personal watercraft, ATVs, and tractors on your property." (Doc. No. 48-1 at PageID# 1559.) Two years later, in July 2016, Mr. Grippi sent another letter to Badell, in which he stated, in part: "My office is in receipt of complaint after complaint from Roaming Shores residents regarding the unacceptable and ever increasing amount of 'junk' on your property. Your refusal over the years to even partially meet repeated requests to cleanup and remove debris and excessive machinery from your yard has left the village frustrated and now, angry. *** As a result, we are preparing to take aggressive action. To avoid a legal battle, you need to either sell your home and leave town or begin ridding your property of access [sic] stuff." (Doc. No. 48-1 at PageID# 1667.) In December 2016, Mr. Grippi sent another letter advising Badell that he was in violation of several zoning ordinances and stating as follows: "[Y]ou now have until February 1, 2017 to remove all unlicensed/unregistered/inoperable vehicles from your property and to also relocate to a permitted enclosure or an off-site storage facility items currently stored in your open yard." (Doc. No. 48-1 at PageID# 1703.)

[3] Both parties attach various exhibits in support of their briefing relating to the Village Defendants' Motion for Summary Judgment, including exhibits used during the deposition of Defendant Bennett. *See* Doc. Nos. 48-1, Doc. Nos. 65-2 through 65-5, 65-7 through 11. None of the Exhibits cited by the parties herein are formally authenticated via affidavit. While Mr. Bennett's deposition testimony would be sufficient to authenticate some of these Exhibits (such as the police reports and records that he authored or reviewed), a number of the documents attached to the parties' briefing consist of documents that Mr. Bennett did not author and of which he had no knowledge. However, neither party objects to any of the various Exhibits attached to the summary judgment briefing on the grounds that they are not properly authenticated.

at PageID#s 1547-1555, 1560-1596, 1606-1616, 1621-1640.) Several of these Reports document alleged threats of physical violence. *See, e.g.*, Doc. No. 48-1 at PageID# 1550 (neighbor allegedly threatened that he would "burn [Badell's] house down with him inside"); PageID# 1555 (neighbor allegedly threatened to kill Badell); PageID# 1563 (Badell allegedly threatened to kill neighbor); PageID# 1580-1581 (neighbor allegedly threatened to assault and/or kill Badell); PageID# 1586 (same). In some of these Reports, Badell is described as "very upset," "tearful," shaking, crying, and afraid. *See, e.g.*, Doc. No. 48-1 at PageID# 1550, 1581.

### ii.  Defendant Bennett and the Roaming Rock Shores Subdivision

Defendant Daniel Bennett began working in the Village of Roaming Shores Police Department in 2009, first as a part-time auxiliary officer, then as a full-time officer, and later as a Sergeant and/or Acting Chief. (Deposition of Daniel Bennett (Doc. No. 47-1) at Tr. 29-30, 40-42, 50.) He resigned in January 2018 and moved out of State. (*Id*. at Tr. 33.)

Bennett testified that he first met Defendant Badell in approximately 2009. (*Id*. at Tr. 141-142.) Bennett occasionally spent personal time with Badell, talking and/or sharing a meal. (*Id*. at Tr. 153-156.) In addition, Bennett testified that he rode jet skis with Badell on one occasion and may have invited him to attend church with Bennett and his family. (*Id*. at Tr. 156, 160.) Bennett testified that he knew Badell to be a "very happy person on many occasions" but that he (i.e., Bennett) became concerned about Badell's mental health as his relations with the RRA and his neighbors deteriorated. (*Id*. at Tr. 145-146, 331-332.)

---

In the absence of any objection, the Court cites to and relies on these documents in resolving the Village Defendants' Motion for Summary Judgment.

4

The record reflects that Defendant Bennett had his own issues with the RRA as well.  At all times relevant herein, Bennett owned a home on Hayford Road in Rock Creek, Ohio. (Doc. No. 1 at ¶ 12.)  Bennett testified that, when he purchased this property, it was "with the understanding that it was not within the Village of Roaming Shores, and that it was not a part of the RomeRock Association."  (Bennett Depo. (Doc. No. 47-1) at Tr. 261-262.)  At some point after purchasing the property, Bennett began receiving notifications from the RRA that his property was, in fact, part of the Association and that he owed various dues and assessments.  (*Id*.)  In September 2015, Bennett wrote a letter to the RRA, requesting that it provide any documentation that it believed supported its assertion that Bennett's property was part of the Association.  (Doc. No. 48-1 at PageID#s 1641-1642.)  An attorney for the RRA responded via letter dated November 2, 2015 and provided copies to Bennett of various Warranty Deeds and Agreements with prior owners of the property.  (*Id*. at PageID#s 1643-1648.)  This letter concluded by stating "please let me know whether or not you intend to pay the RRA annual charges and assessment in exchange for special membership privileges, including the use of the lake.  If not, the Board may vote to suspend your privileges." (*Id*. at PageID# 1644.)  Bennett did not respond to this letter.  (*Id*. at PageID# 1661.)

On December 31, 2015, RRA Board President Tom Sopko sent an email to Defendant John Ball, the Mayor the Village of Roaming Shores.  Therein, Mr. Sopko asked to schedule a meeting with Mayor Ball regarding "a Village employee who is in arrears with the Association Dues and Assessments."  (Doc. No. 48-1 at PageID#1660, Deposition of John Ball (Doc. No. 44-1) at Tr. 55, 65, 71; Doc. No. 44-1 at PageID#642.)  Defendant Ball testified that he felt that Mr. Sopko's email was "out of line" and "not right," and that he responded to Mr. Sopko via email stating that he would not participate in the RRA's "collection efforts."  (Ball Depo. (Doc. No. 44-1) at Tr. 41-42, 59, 65-

5

66, 69-70.) Ball also forwarded the December 31, 2015 email to Defendant Bennett. (*Id.* at Tr. 73-74; Bennett Depo (Doc. No. 47-1) at Tr. 279.)

Defendant Bennett provided the December 31, 2015 email to Village of Roaming Shores Police Officer David Bonfield and advised him to "document" the incident. (Bennett Depo. (Doc. No. 47-1) at Tr. 276.) Officer Bonfield created Police Report No. 15-0468. (Doc. No. 48-1 at PageID# 1649-1660.) This Police Report lists the offense as Extortion under Ohio Rev. Code § 2905.11(A)(5), which is a third-degree felony. (*Id.*) The victim is identified as Dan Bennett and the names of the suspected offenders are various RRA Board Members, including Martin. (*Id.*) Bennett testified that the matter was referred to the Ohio BCI for investigation but that it "went nowhere." (Bennett Depo. (Doc. No. 47-1 at Tr. 286.)

On February 24, 2016, counsel for the RRA wrote a letter to Bennett, stating that he has "been authorized to file suit seeking, among other things, money judgment for unpaid dues and assessments and a determination of my client's rights and your rights and obligations with respect to membership in RRA and compliance with the By-Laws and Rules and Regulations of RRA." (Doc. No. 48-1 at PageID#s 1661-1662.) The parties do not direct this Court's attention to any evidence reflecting how this dispute was resolved.[4]

### iii. Escalation of the Disputes between Badell, Plaintiff and the RRA

Meanwhile, Badell's problems with the RRA and his neighbors continued to escalate. In June 2016, Badell delivered a written statement to Defendant Bennett in his capacity as Village Police Officer. (Doc. No. 48-1 at PageID# 1663-1666.) Bennett created Police Report No. 16-0184 and

---

[4] It appears that, at some point, Bennett paid the Association charges for the years 2015, 2016 and 2017. (Doc. No. 48-1 at PageID# 1790.)

listed the offense as "Trespass Complaint." (*Id*.)  In the Narrative portion of the Report, Bennett

writes as follows: "On 06/03/2016 at approximately 1015 hrs I received a written statement from Bill

Badell . . . to formally notify all members of the RRA Board, their employees, or anyone acting in

[sic] behalf of the RRA are no longer welcome onto his property in any way." (*Id*. at PageID# 1664.)

Attached to the Report was a handwritten statement of Badell, which states as follows:

> As of this day June 1 2016, no one from the Roam Rock Association and anyone
> associated with the Roam Rock Association is ever to be on the lot of [omitted.]  This
> is gaining [access] in any way from the Roads, the [Recreational Lots] and from the
> water.  It will be considered harassment and stalking.  I have talk[ed to] RSPD Officers
> and that's are all of the above [sic] or I will pursue criminal charges.

(*Id*. at PageID# 1666) (misspellings corrected).  Bennett testified that he delivered Badell's

"statement" to the RRA.  (Bennett Depo. (Doc. No. 47-1) at Tr. 302.)

On August 2, 2016, Badell "flagged down" Defendant Bennett in the area of Badell's

residence and reported that he "had again been harassed by John Martin." (Doc. No. 48-1 at PageID#

1686.)  Bennett took a written statement from Badell, in which he alleged that Martin had stood at

the very edge of his property, called him names, and threatened him.[5]  (*Id*. at PageID#s 1687-1688.)

Bennett created Police Report No. 16-0278 and listed the offense as "neighbor dispute." (*Id*. at

PageID#s 1683-1688.)

On September 17, 2016, Badell again called the Village police regarding an incident involving

Martin.  (Doc. No. 48-1 at PageID#s 1689-1693.)  Village Police Officer Kristen Fortune responded

to Badell's residence and later created Police Report No. 16-0339.  (*Id*.)  The Report names Martin

as a suspect in the offense of Menacing by Stalking in violation of Ohio Rev. Code § 2903.211.  (*Id*.)

---

[5] Badell's written statements are attached to Police Report No. 16-0278.  Therein, Badell alleges that Martin "stood with
his pedal bike and dog at the end of my drive," clenched his fist, "gritted his teeth," called him names, threw his bike
down, and made various threats.  (*Id*. at PageID#s 1687-1688.)

In the Narrative portion of the Report, Officer Fortune stated that Badell accused Martin of frightening him by "walking towards him at a fast, intimidating pace" and calling him insulting names. (*Id*. at PageID# 1692.) Badell again called the Village Police regarding Martin on November 24, 2016. (Doc. No. 48-1 at PageID# 1699.) Badell alleged that Martin "was standing in the roadway extremely close to his [i.e., Badell's] driveway staring at him" and that "Martin told him that someone just needs to beat him up already." (*Id*.)

It was around this point in time that Bennett became concerned about Badell's mental health. (Bennett Depo. (Doc. No. 47-1) at Tr. 331-332.) Specifically, Bennett was concerned that Badell might be "having some depression" and letting his disputes with his neighbors "consume too much of his time." (*Id*. at Tr. 332.) Bennett testified that he spoke with Badell and recommended that he seek out "some type of counseling." (*Id*. at Tr. 331.) In December 2016, Badell had several visits with counselors at the Community Counseling Center of Ashtabula. (*Id*. at Tr. 338.) *See also* Doc. No. 48-1 at PageID# 1710. In early January 2017, one of Badell's counselors requested a meeting with both Badell and Bennett "in order to discuss the ongoing issues Bill has been dealing with, and to get a better understanding of the back story." (Doc. No. 48-1 at PageID# 1710.) Bennett participated in a meeting with Badell and his counselors on January 6, 2017 and created a "Narrative Supplement" documenting this meeting.[6] (*Id.*)

The record reflects that several incidents thereafter occurred between Badell and Martin in April 2017. On April 5, 2017, Martin went to the Village Police Department to report that, earlier

---

[6] Prior to the meeting, Badell had consented to the release of his mental health counseling records to the Village Police Department. (Bennett Depo. (Doc. No. 47-1) at Tr. 340.) Bennett received several of Badell's mental health records from the Counseling Center on January 6, 2017, all of which were dated December 2016. (*Id*.) *See also* Doc. No. 48-1 at PageID# 1710.

that day, Badell had "called the dog warden on him saying that his dogs are running loose." (Doc. No. 48-1 at PageID# 1722.) Martin disputed Badell's allegations and accused Badell of harassing him. (*Id*.) On April 7, 2017, Bennett created a formal Police Report that attached the "Narrative Supplement" relating to Bennett's meeting with Badell and his mental health counselors. (*Id*. at PageID#s 1725-1729.)

On April 10, 2017, Village Police Officers Pinkett and Kern were dispatched to Badell's residence after Badell called 911 regarding Martin. (Doc. No. 48-1 at PageID# 1733.) During his deposition, Martin recalled this incident as follows:

> Q: Right. And what I want to do was talk to you about the events of April 10, 2017, that led to that criminal charge being filed on April 28th, 2017. Tell me what you recall about the April 10th, 2017, event?
>
> A: I recall that as was my habit, I was exercising my dogs, riding the bike, they were, as always, they were leashed and under my control. They were physically attached to the bike. As part of my usual route, yeah, I had gone by Badell's house and made a loop and on my second time passing Badell's house, on my way back out, he didn't stop me, but he was yelling at me and taking my pictures. So I stopped, got off the bike and stood there and asked him if he was getting good enough pictures. And then he told me he was going to go call the police. Of course, this is that evidence picture of me flipping him off. And he went inside to call the police and I waited for the police to arrive, so they could see, in effect, what was going on, which was nothing. But that is [when] Officers Kern and Pinkett arrived on scene and proceeded to take statements from myself and from Badell.

(Martin Depo. (Doc. No. 43-1) at Tr. 34-35.) Martin also acknowledged in his deposition that he "took one step and put my foot on [Badell's] driveway." (*Id*. at Tr. 36.)

Officers Pinkett and Kern arrived at the scene and spoke with both Martin and Badell. In a Police Report created later that day, Officer Pinkett stated that Martin accused Badell of yelling racial slurs at him and threatening to "bash [his] head in with a pipe." (Doc. No. 48-1 at Page ID# 1733.) Badell denied threatening Martin with a pipe. (*Id*. at PageID# 1734.) He alleged that Martin made

9

derogatory remarks to him (including several about Badell's wife), "lunged" at him, and threatened

to kill him.  (*Id*. at PageID#1735.) Officer Pinkett observed that Badell was "extremely upset" and

scared.  (*Id*. at PageID# 1733.)  Officer Pinkett wrote as follows:

> I asked Badell if Martin was on his property when he aggressively lunged at him.
> Badell advised that he was. I asked him if he believes that Martin was going to cause
> him serious physical harm. Badell without any hesitation said "way! because of his
> fierceness." I asked him if there was any more contact between him and Martin before
> I arrived. He advised that there was not. I explained that I will be sending this report
> to the prosecutor for charges against Martin for aggravated menacing and thanked
> Badell for his time.

(*Id*. at PageID# 1735.)[7]  Officer concluded the Report by stating that "Sergeant Bennett later sent this

report to the prosecutor for charges."  (*Id*.)

On April 28, 2017, a criminal complaint was filed in the Ashtabula County Court, Western

Division, charging Martin with one count of menacing by stalking in violation of Ohio Rev. Code §

2903.211(A)(1).  (Doc. No. 48-1 at PageID# 1755.)  *See also State v. Martin*, Ashtabula Western

County Court Case No. 2017-CR-B-00277.  This complaint was signed by Defendant Bennett.  (*Id*.)

Martin testified that he was not arrested in relation to this charge; rather, he was served a summons

through mail to appear in court.  (Martin Depo. (Doc. No. 43-1) at Tr. 37-38.)  Martin appeared in

state court on May 11, 2017 before Judge David Schroeder, at which time he posted a personal

---

[7] The record also contains a Police Report dated April 18, 2017, in which Village Police Officer Keeler reports he was
dispatched to Badell's residence "for report of an unwanted person." (Doc. No. 48-1 at PageID#s 1763-1772.)  According
to the Report, Badell alleged that Martin was riding by his house and started yelling things at him, including threatening
to take his house and "rip that camera out of [his] hands." (*Id*. at PageID# 1767, 1769.)  Officer Keeler spoke with Martin
who accused Badell of "yelling threats to destroy [Martin's] house and rape his wife." (*Id*.)  Martin denied threatening
Badell and stated that he "would like something done about these latest threats." (*Id*.) In a written statement, Martin stated
that Badell regularly made "unbelievable claims of influence and friendship with local and county law enforcement and
prosecutors," used racial slurs, and threatened Martin with "violent consequences." (*Id*. at PageID# 1770.) Martin also
reported as follows: "On this day he included my family which changes everything for me.  He specifically claimed he
would have me arrested or probably killed, he would then throw my son out on the streets and spend his time raping my
wife.  This is a threat.  I take this very seriously." (*Id*.)

recognizance bond in the amount of $2500.  (*Id*.)  *See also* Doc. No. 48-1 at PageID#s 1756, 1758, 1762.  At that time, Judge Schroeder imposed a no contact order on Martin with respect to Badell. On the Arraignment Sheet dated May 11, 2017, Judge Schroeder indicated that Martin was subject to a "No Contact Order with Bill Badell or his Home Outside of Right of Way."  (Doc. No. 48-1 at PageID# 1762.)  In an entry from that same date captioned "Unsecured Recognizance," the following special condition is listed: "No Contact w/ Bill Badell."  (*Id*. at PageID# 1758.)  Finally, the Journal Entry entered on May 11, 2017 states as follows:

> As condition of defendant's pre-trial release in this case, he/she is not to have any direct or indirect contact whatsoever, with **BILL BADELL** and is not to be within 300 feet of HIM or where [HE] live(s), work(s), or attend(s) school, including parking lots thereof.

(*Id*. at PageID# 1756) (emphasis in original). The Journal Entry is signed by both Judge Schroeder and Martin.  (*Id*.)

During his deposition, Bennett testified that he was familiar with the Journal Entry but that he was not familiar with (and would not have had a copy of) either the Arraignment Sheet or the Personal Recognizance Bond.  (Bennett Depo. (Doc. No. 47-1) at Tr. 354-358.)  Of particular note, Bennett testified that he was not aware that the Arraignment Sheet indicated that the no contact Order applied to Badell "Outside of Right of Way."  (*Id*. at Tr. 356.)  *See also* Doc. No. 48-1 at PageID# 1762.)

After several months of relative quiet, matters between Badell and Martin again deteriorated. On September 18, 2017, Badell called the Village Police Department to report that Martin had been outside of his house.  (Doc. No. 48-1 at PageID# 1794-1799.)  Officers Pinkett and Tara Ryhal responded to the scene.  (*Id*.)  Officer Pinkett documented the incident (in relevant part) as follows:

11

> Having knowledge that there was a no-contact order put in place by Judge Schroeder stating that John is not to be within 300 feet of Bill, I advised dispatch that I was in service and en route with Officer Ryhal to the noted location.  ***
>
> Arriving on scene, we made contact with a visibly upset Bill Badell by the front door of the residence and asked him what happened.  He went on to explain that on 9-18-2017 at approximately 1831 hours, while walking up a hill located in the north side of his house, he observed someone standing in the street "flicking him off."  Immediately identifying the male as John Martin, he told him that he was not allowed to be there, taking several pictures of him in the process before running inside to call 911.
>
> Looking at the pictures provided by Bill, I observed they were of a male subject wearing a bright orange t shirt and blue jean shorts riding a bicycle on Jefferson Point directly outside of his residence. Closer observation revealed the male subject in the photographs appeared to be John Martin. Providing Bill with voluntary statement forms, we cleared the residence to speak with John Martin … about the incident.
>
> Arriving on scene, we made contact with John at the front door who we observed was wearing a bright orange t shirt and jean shorts. Being that his clothing description was almost identical to the ones in Bill's photographs, we asked John if he was on Bill's property. John advised that he was not on his property, but rather outside of it on his bicycle. Thanking him for his cooperation, we cleared without further incident.
>
> Making contact with Bill at his residence once more, we collected the written statements and after speaking with him a bit further, we advised that a report on the matter will be completed and sent to the prosecutors to review.  We also advised that if John were to cause any more issues, to call 911.

(*Id*. at PageID# 1799.)  Officer Ryhal prepared Police Report No. 17-0416, which listed the offense as Menacing by Stalking in violation of Ohio Rev. Code § 2903.211.  Bennett signed the Report as the "Approving Officer."  (*Id*. at PageID# 1794.)

Badell again contacted the Village Police about Martin on September 24, 2017. (*Id.* at PageID# 1806.)  Badell reported that Martin was "standing beside the stop sign at the end of Bill's street on his bike walking his dog."  (*Id*.)  Officer William Moss spoke to Martin, who "admitted to walking his dogs along that road but only because he does not like to walk his dogs on Roam Rock Creek Road."  (*Id*.)  According to Officer Moss, Martin stated that "he would violate the [no contact]

order to keep his dogs safe and was not walking that way to bother Bill." (*Id.*)  The following day, Officer Ryhal returned to the scene with a Rolotape and measured the distance between Badell's driveway and the stop sign where Martin had allegedly been standing.  (*Id.* at PageID# 1808.)  The measurement read 184.3 feet.   (*Id.*)  Officer Ryhal also measured the distance between "the edge of Badell's property" and the stop sign where Martin had allegedly been standing.   (*Id.*)   That measurement read 85.7 feet.[8]  (*Id.*)

On September 28, 2017, Bennett was patrolling the Subdivision when he encountered Martin riding his bicycle within 300 feet of Badell's property.   The record contains body cam video footage of this encounter.   (Doc. No. 49.)   This footage shows that Bennett advised Martin that he was in violation of the No Contact Order and told him to turn around.  (*Id.*)  Martin argued with Bennett for a few minutes but ultimately turned around and rode away from Badell's residence. (*Id.*) Before leaving, Bennett advised Martin that he was going to call the Prosecutor's Office.  (*Id.*)  Bennett testified in deposition that he did, in fact, call the prosecutor's office after this encounter to seek guidance regarding whether to arrest Martin.  (Bennett Depo. (Doc. No. 47-1) at Tr. 348.)

---

[8] On September 25, 2017, Officer Pinkett received a phone call from Badell, who advised that he was "very upset" and "needed to talk."  (Doc. No. 48-1 at PageID# 1813.) Officer Pinkett responded to Badell's residence. In a Police Report created later that day, Officer Pinkett reported as follows: "Arriving on scene, I made contact with Bill at the front doorstep of the residence and asked what the problem was. Almost immediately he began to cry, stating that he is tired of everyone picking on him and explained that he is 'sick and tired' of the ongoing issues with John Martin, Leann Mosses, Kevin Grippi, Randy Rasmussen and the Roaming Shores Association as an entity.  After he stopped crying, I asked Bill if he had thoughts of self-harm. Bill advised that he did not but wished 'it would all end' and stated that he 'does not have anything to live for anymore since his wife and kids left.' Looking for a more specific answer, I calmed him down once more and asked again if he would like to see someone tonight about his thoughts, to which he advised that he was okay and did not want to see anyone. Bill then stated 'I don't want to put a bullet in my brain! I just want things to get better.' Having no reason to believe Bill was a harm to himself or anyone else for that matter, I listened to Bill as he explained the issues in his personal life that were causing such 'pain' and 'agony.' Approximately 30-45 minutes later, Bill advised that he 'felt much better' and with a smile on his face, stated that he was going to watch TV for the remainder of the evening. I advised Bill that should he need to talk again or has thoughts of self-harm, to call the Roaming Shores PD." (*Id.*)

Bennett and Officer Moss returned to Martin's residence later that day[9] to arrest him.  The record contains body cam video footage of Martin's arrest.  (Doc. No. 49.)  This footage shows Martin riding up to his house on his bicycle with two dogs on a leash.  (*Id.*)  Bennett advised Martin that he was under arrest and instructed him to secure his dogs.  (*Id.*)  Martin responded by stating "go to hell" and calling Bennett "a f*** bully."  (*Id.*)  Bennett again instructed Martin to secure his dogs.  (*Id.*)  Martin did not comply and, instead, told Bennett to "get your f***ing car off my property."  (*Id.*)  At this point, Officer Moss approached Martin to effectuate an arrest. (*Id.*)  Martin struggled and pushed Officer Moss to the ground.  (*Id.*)  Officer Moss then got up and pushed Martin to the ground.  (*Id.*)  Bennett drew his Taser but did not deploy it.  (*Id.*)  Martin got up and Bennett instructed him to put his hands behind his back.  (*Id.*)  Officer Moss and Bennett worked together to handcuff Martin.  (*Id.*)  Martin was then put in Officer Moss' vehicle and transported to the City Jail.[10]  (*Id.*)

During his deposition, Martin acknowledged that he pushed Officer Moss and that Officer Moss fell to the ground.  (Martin Depo. (Doc. No. 43-1) at Tr. 46-47.)  Martin testified that Bennett never approached him.  (*Id.* at Tr. 47-48.)  Martin further testified that he was not injured during the arrest and did not seek medical attention.  (*Id.* at Tr. 49.)

Assistant Ashtabula County Prosecutor John Lewis prepared charges against Martin based on the events of September 18, 2017, September 24, 2017, and September 28, 2017.  (Deposition of John

---

[9] In their summary judgment briefing, the Village Defendants state that Martin was arrested on September 29, 2017. Although the criminal complaints relating to Martin's arrest (i.e., for assault on a police officer) were filed in state court on September 29, 2017, the text of those complaints indicate that Martin was arrested on September 28, 2017. *See* Doc. No. 48-1 at PageID#s 1818, 1819.

[10] After Officer Moss had driven away from the scene with Martin in his cruiser, Bennett spoke with Martin's wife. The body cam footage captures this conversation. (Doc. No. 49.)  At that time, Mrs. Martin was visibly upset and stated that Badell had previously threatened to rape her.  Bennett stated that he had referred her complaint to the Prosecutor's Office but that the prosecutor had declined to prosecute.  Bennett advised Mrs. Martin to contact the Prosecutor's Office directly.

Lewis (Doc. No. 66-1) at Tr. 10-12, 33-40.)  Several separate criminal cases were filed against Martin in the Ashtabula County Court, Western Division on September 29, 2017 as a result of these charges. First, in Case No. 2017-CR-00709, criminal complaints were filed against Martin for the misdemeanor charges of intimidation of a crime victim and menacing by stalking, stemming from the incident with Badell on September 18, 2017.  *See State v. Martin*, Ashtabula Western County Court Case No. 2017-CR-B-00709.  Second, in Case No. 2017-CR-B-00710, criminal complaints were filed against Martin for the misdemeanor charges of intimidation of a crime victim and menacing by stalking, stemming from the incident with Badell on September 24, 2017.  *See State v. Martin,* Ashtabula Western County Court Case No. 2017-CR-B-00710.  Finally, in Case Nos. 2017-CR-00712 and 00713, criminal complaints were filed against Martin for two felony charges of assault, as well as misdemeanor charges of resisting arrest and menacing by stalking, stemming from the events of September 28, 2017.  *See State v. Martin*, Ashtabula Western County Court Case Nos. 2017-CR-A-00712, 2017-CR-B-00713.  Defendant Bennett signed each of these criminal complaints.  (Doc. No. 48-1 at PageID#s 1814-1820.)

On September 29, 2017, Martin appeared in court for his initial appearances. In the misdemeanor cases, bond was set in the amount of $5,000 cash/surety.  With regard to the felony charges, the court set a $50,000 cash/surety bond, restated the prior no contact order, and ordered Martin to undergo a mental health evaluation, explaining in a subsequent entry as follows:

> In the instant matter the escalation of the frequency and severity of the charges as set forth above remain a great concern to this court regarding the safety of the community and the victim. What started as a neighbor dispute, over the passage of time, included additional incidents directed at the same neighbor and ultimately culminated in the felonious assault charges involving two police officers who responded to a follow up complaint against the defendant.  Based on this factual history as well as the demeanor of the defendant in open court this court had grave concerns about the defendant's mental health and the safety of the community. This court concludes that those factors

> constitute the extraordinary circumstances contemplated by Rule 5B of the Ohio Rules of Criminal Procedure and it was for that reason the court ordered a mental health examination of the defendant on the date of his initial appearance on the felony charge. Said mental health examination for purposes of competence and or bond conditions shall proceed and the court will issue a separate order regarding the examination of the defendant.

*See* Docket Sheets for Case Nos. 2017-CR-00709, 00710, 00713 (October 23, 2017 Judgment Entry).[11]

It appears that Martin remained incarcerated pending the completion of the above mental health examination. The state court docket sheets reflect that the Forensic Psychiatric Center of Northeast Ohio submitted its evaluation of Martin on November 20, 2017. (*Id.*) The following day, counsel for Martin filed a Motion to Reinstate Bond with House Arrest at Different Location. (*Id.*) On November 22, 2017, the state court granted the motion under the conditions that Martin (1) reside at his stepdaughter's residence in Parkman, Ohio; (2) be placed on electronically monitored house arrest;[12] (3) have no contact with Badell and only be present at any Roaming Shores property with the prior consent of the court or in the presence of law enforcement; and (4) be permitted to travel from Parkman, Ohio to the court for all scheduled court appearances. (*Id.*) The state court subsequently held a competency hearing on December 18, 2017 and found Martin competent to stand trial. (*Id.*)

---

[11] In addition, the state court docket sheet reflects that, on October 18, 2017, Martin's bond was revoked in the underlying case involving the April 10, 2017 incident due to the charges filed relating to the September 18, 24 and 28 incidents. *See* Docket Sheet for *State v. Martin*, Ashtabula Western County Court Case No. 2017-CR-B-00277.

[12] The docket reflects that, on March 30, 2018, the state court granted Martin's motion to modify bond, allowing the removal of the electronic monitoring bracelet so long as Martin remained at his stepdaughter's home in Parkman and only traveled for purposes of work, medical appointments, and court appearances.

On January 10, 2018, the Ashtabula County Grand Jury indicted Martin on two charges of felony assault on a police officer, one charge of menacing by stalking, and one charge of resisting arrest, all of which charges stemmed from the events of September 28, 2017. *See State v. Martin*, Ashtabula County Court of Common Pleas Case No. 2017 CR 00639.  At that time, Case Nos. 2017-CR-00712 and 00713 were bound over to the Ashtabula County Court of Common Pleas. *Id.*

On April 17, 2018, a jury trial was held in the Ashtabula Western County Court with respect to the misdemeanor charges against Martin arising out of the incidents on April 10, 2017, September 18, 2017, and September 24, 2017.[13]  After a one-day trial, Martin was acquitted of all misdemeanor charges. *See* Docket Sheets for *State v. Martin*, Ashtabula Western County Court Case Nos. 2017-CR-00709, 2017-0CR-00710, 2018-CR-00138.  Several months later, on August 20, 2018, a jury trial was held in the Ashtabula County Court of Common Pleas on the felony assault charges against Martin stemming from the events of September 28, 2017.[14]  *See* Docket Sheet for *State v. Martin*, Ashtabula County Court of Common Pleas Case No. 2017-CR-00639.  Martin was found not guilty of both assault charges on August 21, 2018. *Id.*

## B.  Procedural History

On September 16, 2019, Martin filed a Complaint in the Ashtabula County Court of Common Pleas against the Village of Roaming Shores, Daniel Bennett, Mayor John Ball, and William Badell.

---

[13] The misdemeanor charges stemming from the April 10, 2017 incident with Badell were originally charged in Case No. 2017-CR-B-00277.  In March 2018, the State filed a Motion to Dismiss that case alleging a "scrivener's error."  The state court granted the motion on March 8, 2018.  A new case was thereafter filed in the Ashtabula Western County Court arising out of the same conduct and assigned Case No. 2018-CR-B-00138.  *See* State Court Docket Sheets, Ashtabula Western County Court Case Nos. 2017-CR-B-00277, 2018-CR-B-00138.  *See also* State Court Docket Sheet, Ashtabula Western County Court Case No. 2017-CR-B-00710 (April 12, 2018 Judgment Entry).

[14] The state court docket sheet indicates that, prior to trial, the State dismissed the resisting arrest and menacing by stalking charges stemming from the events of September 28, 2017.  *See* Docket Sheet for *State v. Martin*, Ashtabula Court of Common Pleas Case No. 2017 CR 00639 (Judgment Entry dated May 16, 2018).

(Doc. No. 1-1.)   The Complaint alleges the following eight claims: (1) Fourth and Fourteenth Amendment excessive force and unreasonable seizure claims under 42 U.S.C. § 1983 against all Defendants (Counts I and III); (2) Fourth Amendment malicious prosecution claims under 42 U.S.C. § 1983 against all Defendants (Count II); (3) Supervisory Liability claims against Defendants Bennett and Ball (Count IV); (4) *Monell* claims against the Defendant Village of Roaming Shores under 42 U.S.C. § 1983 (Count V); (5) Fourth Amendment "private and state actor" claims under 42 U.S.C. § 1983 against all Defendants for unreasonable seizure, excessive force, and malicious prosecution (Count VI); (6) state law claims for abuse of process against all Defendants (Count VII);[15] and (7) state law claims for civil conspiracy against Defendants Bennett and Badell (Count VIII).  (*Id*.)

Defendants Village of Roaming Shores, Bennett, and Ball (hereinafter referred to collectively a "the Village Defendants") removed the Complaint to this Court on October 15, 2019.  (Doc. No. 1.)  The Village Defendants thereafter filed an Answer on October 24, 2019.  (Doc. No. 8.)   Martin filed a Motion to Remand on November 14, 2019, which the Village Defendants opposed.  (Doc. Nos. 14, 15.)  On December 4, 2019, the Court issued a Memorandum Opinion & Order denying Martin's Motion to Remand.  (Doc. No. 18.)

A Case Management Conference was conducted on January 13, 2020, at which time various case management deadlines were set.  (Doc. No. 23.)  Upon motion of the parties, the discovery and dispositive motions deadlines were extended several times over the course of the next year.  *See* Doc. Nos. 28, 29, 30, 31, 32; Non-Document Orders dated Oct. 9, 2020 and Jan. 28, 2021.

---

[15] The Complaint misnumbers Martin's abuse of process claim as Count VI.  (Doc. No. 1-1 at p. 31.)  Upon review, the Court finds that Martin's abuse of process claim should be numbered as Count VII and the Court will refer to it as such throughout.

Defendant Badell did not file an Answer or otherwise respond to the Complaint.[16]  On January 14, 2021, this Court issued an Order to Show Cause, directing Martin to submit an appropriate application for entry of default with regard to Defendant Badell.  (Doc. No. 35.)  Martin filed an Application for Entry of Default against Badell pursuant to Fed. R. Civ. P. 55(a) on March 24, 2021, which the Clerk of Court entered the following day.  (Doc. Nos. 39, 40.)  Martin later filed a Motion for Default Judgment against Defendant Badell pursuant to Fed. R. Civ. P. 55(b) on June 8, 2021.  (Doc. No. 52.)  No response was filed.

Meanwhile, on April 26, 2021, the Village Defendants filed a Motion for Partial Judgment on the Pleadings with respect to Martin's state law claims for abuse of process and civil conspiracy.  (Doc. No. 41.)  Martin did not oppose the Motion.  Rather, the parties subsequently filed a Stipulation for Order of Partial Dismissal with Prejudice with regard to (1) Martin's abuse of process and conspiracy claims as to Defendants Village of Roaming Shores and John Ball; and (2) Martin's abuse of process claim against Defendant Bennett to the extent it is predicated on the extortion investigation described *supra*.  (Doc. No. 56.)  The parties stipulated, however, that Martin's abuse of process and civil conspiracy claims against Defendant Bennett remained to the extent they arise of the criminal prosecution of Martin in or after April 2017.  (*Id*.)  The Court entered this Stipulation the following day, and the Village Defendants' Motion for Partial Judgment on the Pleadings was withdrawn.  (Doc. No. 57.)

On May 4, 2021, the Village Defendants filed a Motion for Summary Judgment, seeking judgment in their favor with respect to all of Martin's federal claims.  (Doc. No. 48.)  With the

---

[16] The docket reflects that service was returned executed as to Defendant Badell on November 9, 2019.  (Doc. No. 13.)

permission of the Court, the Village Defendants filed a Supplemental Memorandum in support of their Motion on July 7, 2021, in which they sought summary judgment in their favor with respect to Martin's remaining state law claims. (Doc. No. 61.) Martin filed a Brief in Opposition to the Village Defendants' Motion and Supplemental Memorandum on September 7, 2021. (Doc. No. 65.) The Village Defendants filed a Reply Brief on September 24, 2021. (Doc. No. 68.)

## II.  Motion for Summary Judgment (Doc. No. 48)

### A.  Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v.*

*Whirlpool Corp.*, 295 Fed. Appx 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 Fed. Appx at 508-09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

### B.    Analysis

#### 1.    Excessive Force, Unreasonable Seizure, "Private and State Actor" and state law Civil Conspiracy Claims (Counts I, III, VI, and VIII)

The Village Defendants move for summary judgment in their favor with respect to Martin's federal claims under 42 U.S.C. § 1983 for unreasonable seizure, excessive force, and "private and state actor" constitutional deprivations (Count I, III, and VI); as well as his state law civil conspiracy claim (Count VIII) against Bennett. (Doc. Nos. 48, 61.) In his Brief in Opposition, Martin fails to either acknowledge or address the Village Defendants' arguments with respect to these claims.

The Court finds that Martin has abandoned (1) his claims against the Village Defendants for unreasonable seizure, excessive force, and "private and state actor" constitutional deprivations; and (2) his state law civil conspiracy claim against Bennett. As the Sixth Circuit has recognized, its "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of*

*Michigan, Inc.*, 545 Fed. Appx 368, 372 (6th Cir. 2013).  *See also Wierengo v. Akal Sec., Inc.*, 580 Fed. Appx 364, 369 n.1 (6th Cir. 2014) ("Akal moved for summary judgment on Wierengo's federal- and state-law claims. Wierengo did not discuss her state-law claims in her response brief, and the district court held that they were abandoned. We agree."); *Hicks v. Concorde Career Coll.*, 449 Fed. Appx 484, 487 (6th Cir. 2011) ("The district court properly declined to consider the merits of this claim because Hicks failed to address it in either his response to the summary judgment motion or his response to Concorde's reply brief."); *Dulaney v. Flex Films (USA), Inc.*, 2021 WL 3719358 at * 5 (6th Cir. August 23, 2021).

Accordingly, the Village Defendants' Motion for Summary Judgment is granted with respect to Counts I, III, VI, and VIII of the Complaint.  The Court will address Martin's remaining federal and state claims, below.

### 2.    Remaining Federal Claims

To maintain a claim under 42 U.S.C. § 1983, a plaintiff must establish that he or she was deprived of a right secured by the Constitution or the laws of the United States, and that the deprivation was caused by a person acting under color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Simescu v. Emmet Cty. Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991).  Here, there is no dispute that the Village Defendants acted under color of state law.  As such, the only remaining question is whether Martin was deprived of a right secured by the Constitution or the laws of the United States.

However, "[p]olice officers are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015).  To determine whether an officer is entitled

22

to qualified immunity, courts "apply a well-established two-prong test: (1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such that a reasonable official would understand that what he is doing violates that right." *Id*. These steps may be addressed in any order, and the defendant officer need only prevail on one of them to be granted qualified immunity. *See Coffey v. Carroll*, 933 F.3d 577, 584 (6th Cir. 2019); *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018).

With regard to the second step, "clearly established" means that the law is so clear at the time of the incident that every reasonable officer would understand the unlawfulness of his conduct. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). As the Supreme Court recently explained:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (*per curiam* ), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd, supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ----, ----, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (*per curiam* ). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff, supra*, at 2023 (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the

> conclusion that [the rule] was firmly established." *Anderson, supra*, at 641, 107 S.Ct.
> 3034.

*Id.* at 589-90. Thus, in evaluating whether a constitutional right was clearly established for purposes of qualified immunity, courts "must examine the *particular* situation that [the defendant officers] confronted and ask whether the law clearly established that their conduct was unlawful." *Howse v. Hodous*, 953 F.3d 402, 407 (6th Cir. 2020). As such, for each claim below, the Court will assess whether a violation occurred, and, if necessary, whether that violation was of a clearly established right.

### a.        Malicious Prosecution (Count II)

In Count II of his Complaint, Martin alleges that the Village Defendants violated his Fourth Amendment right to be free from wrongful prosecution without probable cause when they instituted criminal proceedings against him based on the incidents on April 10, 2017,[17] September 18, 2017, September 24, 2017 and September 28, 2017. (Doc. No. 1-1 at ¶ 92.) Martin alleges that "the initiation of criminal proceedings and continuation of their efforts to prosecute Plaintiff was done to punish or injure [him] for trying to enforce local Association rules against Defendant Badell (cleaning up his property) and Defendant Bennett (paying his Association dues) and for not officially supporting Defendant Bennett in his run for Chief of Police." (*Id*. at ¶ 95.) Martin claims that the Village Defendants made, influenced and/or participated in the prosecution against him and that such prosecution lacked probable cause. (*Id*. at ¶¶ 93, 96.)

---

[17] Count II of the Complaint does not explicitly reference the April 10, 2017 incident. However, the Complaint does allege that the criminal proceedings instituted in September 2017 and February 23, 2018 constitute malicious prosecution. (Doc. No. 1-1 at ¶ 92.) As noted *supra*, the criminal charges filed as a result of the April 10, 2017 incident were originally filed on April 28, 2017 but were subsequently dismissed and refiled in February 2018. *See* State Court Docket Sheets, Ashtabula Western County Court Case No. 2017-CR-B-00277, 2018 CR-B-00138. Thus, the Court construes Count II as asserting a malicious prosecution claim based on Martin's prosecution for the April 10, 2017 incident.

The Village Defendants move for summary judgment on this claim, asserting a variety of reasons that judgment in their favor is warranted. (Doc. No. 48 at pp. 12-15.) The Village Defendants first argue that Defendant Ball is entitled to judgment in his favor because he "was/is not a police officer and there is absolutely no evidence whatsoever, the inexorable zero, that Mayor Ball was ever present or had anything to do with any of Plaintiff's citations, his arrest, or criminal prosecutions." (*Id*. at p. 6.) With respect to Defendant Bennett, the Village Defendants argue that summary judgment is warranted as to the misdemeanor charges at issue because there is no evidence that Defendant Bennett made, influenced, or participated in the decision to prosecute those charges. (*Id*.) The Village Defendants further assert that this claim fails with respect to the misdemeanor charges pre-dating Martin's arrest on September 28, 2017 because Martin did not suffer a deprivation of liberty as a result of those charges. (*Id*.) The Village Defendants argue that, with respect to the felony charges at issue, summary judgment is warranted because Martin's indictment by the grand jury conclusively establishes probable cause. (*Id*.) The Village Defendants assert that, because Martin has not demonstrated that Bennett violated his Fourth Amendment right to be free from malicious prosecution, Defendant Bennett is entitled to qualified immunity with respect to that claim. (*Id*.)

In opposition, Martin asserts that genuine issues of material fact preclude summary judgment with respect to his prosecution stemming from the April 10, 2017 incident. (Doc. No. 65 at pp. 9-14.) Martin asserts that Bennett made, influenced, or participated in the decision to prosecute because he "brought the police report of April 10, 2017 to the Ashtabula County Prosecutor's Office, asking them to pursue charges against Plaintiff; [and] he then swore out a complaint for Aggravated Menacing, a misdemeanor, against Plaintiff, thereby influencing the decision to initiate legal proceedings against Plaintiff." (*Id*.) Martin further asserts that there is a genuine issue of material

25

fact as to whether there was probable cause for the prosecution stemming from the April 10, 2017 incident.  (*Id*.)  Specifically, Martin argues that "Bennett did not consider the exculpatory evidence in Plaintiff's favor, effectively concealing this evidence from the prosecutors involved in deciding whether to pursue a criminal case."  (*Id*.)  Martin further complains that "Bennett pursued charges only against Plaintiff in regard to the incident of April 10, 2017, when in fact Plaintiff was complaining of like conduct on Badell's behalf as well."  (*Id*.)  Lastly, Martin argues that the state court's imposition of a local travel restriction as a condition of bond constitutes a deprivation of liberty for purposes of his malicious prosecution claim.  (*Id*.)  Martin does not acknowledge or address the Village Defendants' argument that Defendant Ball is entitled to judgment in his favor with respect to this claim.

"Under federal law, a plaintiff must prove four elements to establish a malicious prosecution claim: (1) that a criminal prosecution was initiated against the plaintiff and that the defendant 'made, influenced, or participated in the decision to prosecute;' (2) that the state lacked probable cause for the prosecution; (3) that the plaintiff suffered a deprivation of liberty because of the legal proceeding; and (4) that the criminal proceeding was 'resolved in the plaintiff's favor.'"  *Jones v. Clark County, Kentucky*, 959 F.3d 748, 756 (6th Cir. 2020) (quoting *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010)).  "The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person."  *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017).  However, "the § 1983 version of 'malicious prosecution' is not limited to the institution of proceedings; it can also support a claim for 'continued detention without probable cause.'"  *Id.* (citation omitted).

26

The Court first finds that Martin has abandoned his malicious prosecution claim with respect to Defendant Ball.  As discussed above, the Village Defendants expressly argue that Defendant Ball is entitled to summary judgment in his favor with respect to this claim because there is no evidence that he had any involvement in the decision to prosecute Martin.  In his Brief in Opposition, Martin fails to acknowledge or address this argument.  Accordingly, the Court finds Martin has abandoned this claim and hereby grants the Village Defendants' Motion for Summary Judgment on Count II with respect to Martin's malicious prosecution claims against Defendant Ball.  *See Brown*, 545 Fed. Appx at 372; *Wierengo*, 580 Fed. Appx at 369 n.1; *Hicks*, 449 Fed. Appx at 487.

The Court further finds that Martin has abandoned his malicious prosecutions claims relating to the misdemeanor and felony charges filed against him as a result of the incidents occurring on September 18, 24, and 28, 2017 (hereinafter "the September 2017 charges").  The Village Defendants moved for summary judgment in their favor with respect to Martin's claims relating to these charges, raising a number of arguments directed to why Defendant Bennett is entitled to qualified immunity with respect to these prosecutions relating to these specific charges. (Doc. No. 48 at pp. 12-16.) Martin failed to acknowledge or address these arguments. Accordingly, the Village Defendants' Motion for Summary Judgment is granted on Count II with respect to Martin's malicious prosecution claims relating to the September 2017 charges.

In light of the above, the only remaining issue before the Court with respect to Count II is whether Defendant Bennett is entitled to summary judgment in his favor with respect to Martin's malicious prosecution claim relating to his prosecution for the April 10, 2017 incident.

Defendant Bennett argues that he is entitled to judgment in his favor because Martin has not established the first element of a malicious prosecution claim, i.e., that he made, influenced, or

participated in the decision to prosecute with respect to the charges stemming from the April 10, 2017 incident.  The Sixth Circuit has explained that the fact that officers "did not *make* the decision to prosecute does not *per se* absolve them from liability." *Sykes*, 625 F.3d at 311 (emphasis in original). Instead, the first element of a malicious prosecution claim "is met when an officer 'could reasonably foresee that his misconduct would contribute to an independent decision that results in a deprivation of liberty' and the misconduct actually does so." *Jackson v. City of Cleveland*, 925 F.3d 793, 820 (6th Cir. 2019) (quoting *Sykes*, 625 F.3d at 316).  "Whether an officer influenced or participated in the decision to prosecute hinges on the degree of the officer's involvement and the nature of the officer's actions." *Sykes*, 626 F.3d at fn 9 (citing *Malley v. Briggs*, 475 U.S. 335, 344-345 n. 7 (1986)).  "The totality of the circumstances informs this fact determination." *Id*.

"'To be liable for participating in the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating.'" *Richards v. County of Washtenaw*, 818 Fed. Appx. 487, 493-494 (6th Cir. 2020) (quoting *Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015)).  The Sixth Circuit recently explained that "merely filing an allegedly misleading case report, without more active participation, qualifies only as 'passive or neutral' participation and is thus an insufficient basis for a malicious prosecution claim." *Richards*, 818 Fed. Appx. at 493-494.  *See also Skousen v. Brighton High School*, 305 F.3d 520, 529 (6th Cir. 2002). Additionally, "the mere act of physically drafting a complaint that formalizes a decision made by another to charge the plaintiff is insufficient to state [a] claim for malicious prosecution." *Slick v. Bors*, 2018 WL 5275798 at * 4 (N.D. Ohio Oct. 24, 2018).  *See also Halasah v. City of Kirtland, Ohio*, 574 Fed. Appx. 624, 631-632 (6th Cir. 2014).

28

Here, the Court finds that there is no genuine issue of material fact that Bennett did not make, influence, or participate in the decision to prosecute Martin with respect to the April 10, 2017 incident. It is undisputed that Bennett did not respond to the scene on April 10, 2017 or author the Police Report that was created on that date, forwarded to prosecutors, and formed the basis of the April 28, 2017 charge of aggravated menacing. Rather, it was Officers Pinkett and Kern (neither of whom are named Defendants in this action) who responded to the scene and spoke with Martin and Badell. Officer Pinkett drafted the Police Report stemming from this incident (Police Report No. 17-0124), including the Narrative Supplement that includes his observations from the scene and a summary of his conversations with Martin and Badell.[18] *See* Doc. No. 48-1 at PageID#s 1730-1735. Officer Pinkett's Report indicates that "Sergeant Bennett later sent this report to the prosecutor for charges." (*Id.* at PageID# 1735.)

The Village Defendants have come forward with evidence that Defendant Bennett's involvement in this prosecution was very limited. During his deposition, Defendant Bennett testified that (1) the prosecutor's office makes the decision whether to charge someone, and (2) he did not have any communications or meetings with the prosecutor regarding the April 10, 2017 incident. (Bennett Depo. (Doc. No. 47-1) at Tr. 344-350.) Specifically, Bennett testified as follows:

> Q: Well, and you took the [April 10, 2017] report so—pardon me. Dan Pinkett took the report. So I agree you didn't take it. But you would have submitted this to the prosecutor, correct?
>
> A: I don't know if I personally submitted it. A lot of times it would be, you know, whatever officer completed it. One way or another, it got submitted from our agency, yes.

---

[18] Neither Officer Pinkett nor Officer Kern were deposed in this case.

29

Q:    **Do you recall how it was that you ended up signing the charges? Did you talk to the prosecutor beforehand? What happened?**

A:    **No.  So typically what happens with charges is, reports are forwarded to the prosecutor's office.  They review it.  When they're done with it, they contact our office.**  Whoever is at the office when that happens is who goes and signs it.  There's no rhyme or reason.  It could have been anybody there.

Q:    And so I understand the process at Roaming Shores was, the report and the contents of the report only would go to the prosecutor. And then they would make a determination based on the content of the report and any video that you would provide, if any, correct?

A:    Yeah.  Typically, on something that would have video, it would not be a faxed report.  It would be hand delivered to the prosecutor so that they would have video and report all in one.

***

Q:    Anything else that they would get to make the determination?

A:    That would be—I mean, what we would do—so let's say the statement forms, those would be scanned into the report. So there would be a scanned photo of those statements and whatnot included in it.  So basically they would receive everything in that package.

***

Q:    Okay. In any of the matters that where you -- where you dealt with John Martin, did that ever vary or differ or was it always the same process? This will help us go so much faster. Was it always the same process, here's the report, here are videos, here's pictures, that sort of thing?

A:     I would say it's a general standard. I can't think of – you know, I can't recall any difference of procedure. Because everything would be scanned. Yeah. I guess I don't understand how to clarify this.

Q:    The question is, was there any -- do you recall any variation in this customary practice that you've described?

A:    I don't recall any differences, no.

***

30

Q:     **Okay. Can you recall any -- was there any verbal conversation about the charges in April regarding the stalking that we just – stalking charges we just showed you?**

A:      **Not that I recall, I mean.**

\*\*\*

Q:     I get it. And so my next question is, at any point did you sit down with [prosecutor] Harold Specht prior to charging -- and I think I know the answer to this, but I just want to make sure the record is clear -- or any prosecutor who reviewed charges, and explain any of what we testified here today -- of what you testified here today?

A:     **I do not recall. But I do not recall having any sitdown conversation with any of these people**.  The incident of the date of the arrest [i.e. September 28, 2017], I remember delivering the video. And [prosecutor] John Lewis watched -- or  popped it in and started watching it while I was sitting there. But I don't think we had much discussion about it. So, no, not that I can recall.

(*Id.* at Tr. 344-350) (emphasis added).

Prosecutor Harold Specht likewise testified that the charges stemming from the April 10, 2017 incident were "processed through the prosecutor's office," meaning that "the [police] report would have been reviewed by … an assistant prosecutor," the charge was then "drawn up" by the prosecutor's office, and the officer was then called to swear to the validity of the charge by signing the complaint.  (Specht Depo. (Doc. No. 45-1) at Tr. 7-9.)  Mr. Specht testified that, as a general matter, he exercised his own professional judgment in deciding whether to prosecute someone.[19]  (*Id.* at Tr. 99.)  Prosecutor John Lewis testified similarly.  (Lewis Depo. (Doc. No. 66-10 at Tr. 88-89.)

---

[19] While Mr. Specht could not recall if he was the prosecutor that reviewed the April 10, 2017 police report for charges at that time, he reviewed that Report during his deposition and testified that "[i]f I was the prosecutor reviewing this particular report, where Mr. Badell articulated that he felt that he was in harm's way from Mr. Martin, given what he had said in this report or what it is attested to that he said in this report, I would have filed the charge" for menacing by stalking.  (*Id.* at Tr. 17-18.)

Specifically, Mr. Lewis testified that his general practice was to review police reports and any video footage submitted by the Police Department and "do whatever charges I felt were appropriate at the time." (*Id.* at Tr. 7.)  He explained as follows:

> Q:    I take it that in making any decision to prosecute, you're exercising your independent professional legal judgment as to whether the prosecution is appropriate or not; is that correct?
>
> A:    That is correct.
>
> Q:    Okay. And I think you testified a little bit earlier that you don't believe that you ever spoke with Dan Bennett prior to making a decision to prosecute any of the cases involving John Martin; is that correct?
>
> A:    I have no recollection of whether I did speak to Dan Bennett or whether I didn't speak to Dan Bennett. **I don't recall speaking to Dan Bennett, though**.
>
> Q:    Okay. Certainly Dan Bennett did not make the decision to prosecute John Martin; is that correct?
>
> A:    That decision is generally left to our -- the prosecutor's office after we've reviewed the reports and body cam video or whatever else is provided to us.
>
> Q:    I imagine there have been times that you, as a prosecutor, have had police officers attempt to influence your prosecution of a particular suspect; is that fair?
>
> A:    I would say yes.
>
> Q:    **Okay. Do you recall that happening in any of these cases involving John Martin where a Village of Roaming Shores police officer attempted to influence your decision to prosecute John Martin one way or other?**
>
> A:    **No, I don't.**

(*Id.* at Tr. 88-89) (emphasis added).

Martin has not directed this Court's attention to any specific evidence in the record that contradicts or is otherwise inconsistent with this evidence.  Accordingly, the Court concludes that there is no genuine issue of material fact that Bennett qualified only as a "passive or neutral"

32

participant in the decision to prosecute Martin for the April 10, 2017 incident.  Bennett did not further the April 2017 prosecution in any way beyond forwarding the police report to the prosecutor's office and signing the complaint after it had been drawn up by the assistant prosecuting attorney.  As noted above, Bennett did not respond to the scene or author the April 10, 2017 Report.  While he did forward this report to the prosecutor's office, Bennett reasonably relied on Officer Pinkett's description of the scene and summary of his conversations with Martin and Badell.  *See Blevins v. Kirk*, 2019 WL 5151310 at * 5 (6th Cir. May 22, 2019) ("It is settled law that an officer can reasonably rely on information communicated by another officer.")  Notably, Martin does not argue (or direct this Court's attention to any evidence) that the April 10, 2017 Police Report contains false information.

Moreover, the fact that Bennett signed the criminal complaint is irrelevant.  As noted above, "the mere act of physically drafting a complaint that formalizes a decision made by another to charge the plaintiff is insufficient to state [a] claim for malicious prosecution." *Slick*, 2018 WL 5275798 at * 4.  The Sixth Circuit's decision in *Halasah* is instructive.  In that case, Officer Fisher prepared a police report recommending that charges be filed against Halasah for disorderly conduct.  *Halasah*, 574 Fed. Appx. at 626-627.  Fisher finalized and forwarded the report to prosecutor Michael Germano.  *Id.*  Mr. Germano reviewed the report, decided to charge Halasah with Disorderly Conduct, and conveyed this information via fax to Fisher.  *Id*.  Fisher then prepared a complaint, summons and warrant and appeared at a hearing before a magistrate judge.  *Id*.  After Mr. Halasah was acquitted, he filed suit claiming false arrest and malicious prosecution.  *Id*.  The district court granted summary judgment in favor of Officer Fisher and the Sixth Circuit affirmed.  With regard to Halasah's malicious prosecution claim, the Sixth Circuit found as follows:

> Halasah's malicious prosecution claim fails because Fisher did not make, influence, or participate in the decision to prosecute Halasah for Disorderly Conduct. We have long

held that a police officer who did not make the decision to prosecute cannot be held liable for malicious prosecution. *See, e.g., Skousen v. Brighton High Sch.*, 305 F.3d 520, 529 (6th Cir.2002) (citing *Coogan v. City of Wixom*, 820 F.2d 170, 172–73 (6th Cir.1987), *recognized as overruled on other grounds in Frantz v. Vill. of Bradford*, 245 F.3d 869 (6th Cir.2001)).  The record indicates that the decision was not Fisher's. When Fisher completed his incident report, he forwarded to it Germano. Then, as explained in his affidavit, Germano decided to charge Halasah with Disorderly Conduct.

Halasah does not appear to contest that Germano, not Fisher, decided to charge him with Disorderly Conduct so much as he contends that the district court erred in discounting Fisher's role as the person who drafted the Complaint. That Fisher physically drafted the Complaint, however, is irrelevant; by the time Fisher was writing the Complaint, Germano—without Fisher's influence or participation—had already made the decision to prosecute Halasah for Disorderly Conduct. In drafting the Complaint, Fisher was merely formalizing Germano's charging decision. Because Fisher did not make, influence, or participate in the decision to prosecute Halasah for Disorderly Conduct, the district court did not err in granting summary judgment to Fisher on Halasah's malicious prosecution claim.

*Id.* at 631-632.

So, too, here.  As discussed above, the Village Defendants have come forward with evidence that at the time Bennett signed the complaint, the prosecutor had already reviewed the April 10, 2017 Police Report and used his independent judgment in deciding to file charges.  Defendants have also come forward with evidence that Bennett did not consult with, encourage, or otherwise participate in any verbal conversations regarding these charges.  Martin has not directed this Court's attention to any contrary evidence.  Under these circumstances, the Court finds Martin has failed to come forward with evidence to create a genuine dispute over whether Bennett satisfies the first element of a malicious prosecution claim.[20]

---

[20] The Court also finds that, to the extent Martin claims Bennett is liable for actions taken relating to the refiling of these charges in February 2018, such claims are without merit.  As discussed *supra*, Bennett resigned from his position at the Village Police Department in January 2018.  (Bennett Depo. (Doc. No. 47-1) at Tr. 33.)  Martin does not direct this Court's attention to any evidence that Bennett had any involvement in the decision to refile the charges in February 2018.

Martin nonetheless argues that the Village Defendants' motion should be denied because Bennett improperly influenced the decision to prosecute him by "effectively concealing" exculpatory evidence from the prosecutor's office.  (Doc. No. 65 at p. 11.)  Specifically, Martin argues that the prosecutor was not presented with (1) a "handwritten statement of Plaintiff, which explained the incident;" or (2) evidence regarding "relatively recent mental health concerns that Bennett was aware of" involving Badell.  (*Id*. at p. 14.)

The Court rejects this argument.  It is true that a police officer is deemed to have "influenced" a decision to prosecute by providing "untruthful testimony and/or incomplete investigatory materials that were material to the probable-cause determination." *Wilson v. City of Shaker Heights*, 741 Fed. Appx. 312, 317 (6th Cir. 2018) (citing *Sykes*, 626 F.3d at 312, 314-15.)  *See also Mills*, 869 F.3d at 482 ("Investigators are deemed to have participated in a prosecution where 'misstatements and falsehoods in [their] investigatory materials . . . ultimately influenced [a plaintiff's] continued detention.'") (quoting *Sykes*, 625 F.3d at 316).  Here, however, Martin has failed to direct this Court's attention to sufficient evidence in the record to create a genuine issue of material fact that Bennett "concealed" material evidence from the prosecutor's office.

With regard to Bennett's alleged failure to provide the prosecutors with Martin's "handwritten statement," Martin does not clearly identify this statement or direct this Court's attention to its location in the record.  It appears, however, that Martin is referring to certain pages attached to Exhibit 5 to his Brief in Opposition.  (Doc. No. 65-5 at PageID#s 2378-2394.)  Exhibit 5 consists of the April 10, 2017 Police Report (i.e., Police Report Number 17-0124), which includes Officer Pinkett's Narrative Supplement as well as scans of (1) several photographs of Martin giving the middle finger, and (2) a formal written statement of Defendant Badell, which is signed by Badell and witnessed by

35

an Officer.  There is then a blank page, followed by sixteen (16) pages of handwritten notes.  The top of the first page of handwritten notes states "J. Martin 4-10-17."  This document is not signed or witnessed.  Nor has Martin provided an affidavit authenticating this document as his handwritten statement.

Assuming *arguendo* that this document is, in fact, Martin's "handwritten statement" relating to the April 10, 2017 incident, the Court finds Martin has failed to demonstrate that Bennett improperly excluded it from the materials sent to the prosecutor's office.  First, Martin points to no evidence that Bennett (who did not respond to the scene, speak to Martin, or author the police report) was even aware of this handwritten statement or had it in his possession.  Second, Martin fails to explain how the failure to provide this document to the prosecutor's office was "material to the probable cause determination."  *Wilson*, 741 Fed. Appx. at 317.  It is true that, in this handwritten statement, Martin accuses Badell of using racial slurs and threatening him with a pipe.  However, the April 10, 2017 Police Report itself includes this very information.  Indeed, in the Narrative Supplement, Officer Pinkett recounts Martin's "side of the story," including that Badell allegedly (1) "began yelling racial slurs at him;" (2) threatened to "get a confederate flag from the guy around the corner;" and (3) threatened to "bash [Martin's] head in with a pipe."  (Doc. No. 65-5 at PageID#2373.) There is no dispute that Officer Pinkett's Narrative Supplement was provided to the prosecutor. Martin has not pointed to any other specific information in the "handwritten statement" that he believes should have been (but was not) provided to the prosecutor.  Nor has he either demonstrated or argued that any such information would have been material to the probable cause determination.

With regard to the "relatively recent mental health evidence" relating to Badell, the Court presumes Martin is referring to Bennett's January 6, 2017 Narrative Supplement, in which he

36

documents a meeting he attended with Badell and several of Badell's mental health counselors.  (Doc. No. 48-1 at PageID# 1710.)  This Supplement also references several visits that Badell had with counselors at the Community Counseling Center of Ashtabula in December 2016.  (*Id.*)

The Court finds that Martin has failed to demonstrate that information regarding Badell's mental health is exculpatory in nature or otherwise "material" to the probable cause determination. Mr. Specht testified that he was not aware of Badell's mental health issues but that, even if he had been, it would not have changed his decision to charge Martin with menacing.  (Specht Depo. (Doc. No. 45-1) at Tr. 62-64, 89.)  Additionally, Mr. Lewis testified that he would not necessarily consider information regarding a victim's mental health issues to be "exculpatory" and, further, that he does not generally see such information in police reports.  (Lewis Depo. (Doc. No. 66-1) at Tr. 52-55.) Martin does not direct this Court's attention to any evidence or legal authority suggesting that Badell's mental health issues would have been exculpatory or material to the prosecutor's probable cause determination.  Accordingly, the Court finds this argument to be without merit.[21]

For all the reasons set forth above, the Court finds that Martin has failed to come forward with evidence creating a genuine issue of material fact that Bennett made, influenced, or participated in

---

[21] To the extent Martin is arguing that Bennett concealed exculpatory evidence by failing to provide the prosecutor's office with any or all of the previous police reports documenting Badell's conflicts with Martin (such as the June 2016 "Trespass Complaint," the August 2, 2016 Police Report, the September 17, 2016 Police Report, or the April 5, 2017 Police Report), this argument is without merit. Mr. Lewis testified in deposition that it is not the Ashtabula County Prosecutor's Office habit or practice to ask the police department to provide all past police reports involving parties who have criminal complaints against each other.  (Lewis Depo. (Doc. No. 66-1) at Tr. 69-70.)  He further testified that this is, in part, because, absent a conviction for an offense, evidence of prior police reports is "not something you could use in the course of a prosecution." (*Id.*)  Martin does not direct this Court's attention to any contradictory evidence nor does he cite any legal authority in support of an argument that Bennett's alleged failure to provide prosecutors with prior police reports involving the same parties would constitute malicious prosecution under the circumstances presented.

the decision to prosecute him for the April 10, 2017 incident.[22]  Accordingly, Martin has failed to

demonstrate that Bennett violated his Fourth Amendment right to be free from malicious prosecution.

Bennett therefore, is entitled to qualified immunity and summary judgment in his favor with respect

to Count II of the Complaint.

### 2.    Supervisory Liability Claim (Count IV)

In Count IV of the Complaint, Martin alleges that "Defendant Bennett and/or Defendant Ball

had supervisory authority over the Village of Roaming Shores."  (Doc. No. 1-1 at ¶ 112.)  Martin

alleges that Defendant Bennett's and Ball's actions and omissions,[23] in their supervisory capacities,

---

[22] Although Martin abandoned his malicious prosecution claims relating to the September 2017 charges, the Court notes that any such claims would also fail for largely the same reasons discussed above.  As regards to the September 18 and 24, 2017 incidents, Bennett did not respond to the scene or author the police reports associated with those events.  While he did forward both reports to the prosecutor's office and sign the criminal complaints relating to charges associated with those incidents, Martin has not directed this Court's attention to any evidence that he had any further involvement in the decisions to prosecute.  Nor does Martin direct this Court's attention to any other evidence (aside from the evidence discussed above) that Bennett allegedly concealed from prosecutors relating to the September 2017 charges.  Thus, the Court finds Bennett did not make, influence, or participate in the decision to prosecute Martin with respect to the charges associated with those incidents.  The Court further notes that, as regards to the charges associated with the events of September 28, 2017 (including the felony charges arising out Martin's arrest), the Village Defendants argue that Martin's malicious prosecution claims fail because a grand jury indicted him on those charges.  Martin does not acknowledge or address this argument.  Nor does he address the fact that the September 28, 2017 incident is captured on body camera footage.  Accordingly, even if it were to consider Martin's malicious prosecution claims stemming from the September 2017 charges, the Court would find that Defendant Bennett is entitled to qualified immunity because Martin failed to demonstrate a genuine issue of material fact that Bennett violated his constitutional rights with respect thereto.

[23] Specifically, the Complaint alleges the following actions or omissions in support of this claim: "(a.)  Defendant Bennett's efforts to prosecute Association Board members, including Plaintiff, for enforcing the Association's rules and regulations against him: to wit,  Defendant Ball communicated with Defendant Bennett about and discussed Bennett's intentions to prosecute Plaintiff and other Board members for crimes that Plaintiff (and Association members) did not commit, and turned a blind eye to the reckless,  wanton,  and  willful actions  of  Defendant  Bennett  in seeking to retaliate against Plaintiff with baseless prosecutions,  unwarranted pretrial detention,  and excessive and unreasonable force both before and during pretrial detention, as well as the Chiefs baseless recommendation of psychological testing.  (b.) The Chiefs custom of exaggerating in police reports, and/or ignoring the true facts showing Plaintiff's innocence and/or furthering  improper  personal agendas and/or facilitating and/or hiding and/or covering  up police misconduct, including the baseless prosecution and investigation of innocent citizens; and/or (c.) Defendants' swearing of charging instruments and/or directing fellow officers to swear charging instruments that were known by Defendants to be false, incorrect or motivated out of a spirit of revenge or ill will and/or giving presentations to the grand  jury  that resulted  in  individuals being  indicted  on  misinformation  and/or falsehoods and/or exaggerations and/or personal agendas; and/or (d.) Defendants' habit and/or custom of producing charging instruments and/or police reports designed to protect Defendant Badell but punish Plaintiff in furtherance of Defendants' inappropriate goals of baiting Plaintiff and/or other Association Board  members  with  Defendant  Badell  so  that  they  could  be  prosecuted  in  retaliation  for  Plaintiffs  and/or  the

"caused Plaintiff's constitutional deprivation: to wit, he was arrested, detained, and prosecuted without probable cause and/or exculpatory information and evidence was hidden from prosecutors and/or material exculpatory facts were withheld from police reports and charging instruments and/or Plaintiff was subjected to unreasonable force and punishing pretrial detention all in violation of the 4th and 14th Amendments to the United States Constitution, and/or for reasons other than a legitimate law enforcement objective, to wit: to retaliate against Plaintiff for enforcing the Association rules and regulations against Defendants Bennett and Badell and/or for not supporting Defendant Bennett in his bid to become Chief of Police - all followed by a period of unjust pretrial detention while being deliberately indifferent to the rights of Plaintiff." (*Id.* at ¶ 118.)

The Village Defendants move for summary judgment in their favor with respect to this claim. (Doc. No. 48 at pp. 16-17.)  In his Brief in Opposition, Martin argues that the Village Defendants are not entitled to judgment in their favor with respect to Defendant Ball.  (Doc. No. 65 at p. 17.) Specifically, Martin argues that Ball "did act in a deliberate manner in allowing unconstitutional behavior by Bennett" by failing to update police department policies and ensure that officers were properly trained.  (*Id.*)  Martin asserts that "Ball condoned Bennett's actions by allowing Bennett to essentially run the police department however Bennett pleased, without supervision or discipline." (*Id.*)  Martin does not address or acknowledge the Village Defendants' arguments that Defendant Bennett is entitled to summary judgment with respect to this claim.  (*Id.*)

---

Association's efforts to collect unpaid dues from Defendant Bennett and eliminate junk from Defendant Badell's yard - all of which is unrelated to legitimate law enforcement objectives." (*Id.* at ¶ 113.)

As an initial matter, the Court finds that Martin has abandoned his supervisory liability claim with respect to Defendant Bennett.  The Village Defendants expressly argue that Defendant Bennett is entitled to summary judgment in his favor with respect to this claim.  Martin fails entirely to address acknowledge or address Defendants' arguments with respect to Bennett.  Accordingly, the Court finds Martin has abandoned this claim and hereby grants the Village Defendants' Motion for Summary Judgment on Count IV with respect to Martin's supervisory liability claim against Defendant Bennett.  *See Brown*, 545 Fed. Appx at 372; *Wierengo*, 580 Fed. Appx at 369 n.1; *Hicks*, 449 Fed. Appx at 487.

The Court next finds that the Village Defendants are entitled to summary judgment in their favor with respect to Martin's supervisory liability claims against Defendant Ball.  As discussed at length *supra*, the Court has found that Defendant Bennett is entitled to qualified immunity with respect to Martin's malicious prosecution claim because Martin has failed to come forward with evidence to create a genuine dispute that Bennett violated his Fourth Amendment rights.  Moreover, Martin abandoned his unreasonable seizure and excessive force claims against Defendant Bennett. In the absence of evidence that Bennett, in fact, violated Martin's constitutional rights, the Court finds that Martin's supervisory liability claim against Defendant Ball (which is predicated on Defendant Bennett's alleged unconstitutional behavior) also fails.

Accordingly, the Court grants the Village Defendants' Motion for Summary Judgment on Count IV with respect to Martin's supervisory liability claim against Defendants Ball and Bennett.

### 3.    *Monell* **Claim (Count V)**

In Count V of the Complaint, Martin seeks to hold the Village liable for its failure to train and supervise its officers.  (Doc. No. 1-1 at ¶¶ 121-135.)  In *Monell v. Dep't of Soc. Services of City of*

*New York*, the Supreme Court held that § 1983 "imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." 436 U.S. 658, 692 (1978). However, "[t]here can be no liability under *Monell* without an underlying constitutional violation." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014); *accord France v. Lucas*, 836 F.3d 612, 631 (6th Cir. 2016). Because the Court has found that Defendants Ball and Bennett are entitled to summary judgment and that no underlying constitutional violation occurred, the Village is entitled to summary judgment on Martin's *Monell* claim.[24]

### 4. Abuse of Process Claim (Count VII)

Having found summary judgment in favor of the Village Defendants is warranted on all of Martin's § 1983 claims,[25] the Court declines to exercise supplemental jurisdiction over his sole remaining state law claim for abuse of process against Defendant Bennett arising out of Martin's criminal prosecution in or after April 2017.[26]

Pursuant to 28 U.S.C. § 1367(c)(3), district courts may decline to exercise supplemental jurisdiction over state law claims once they have dismissed all claims over which they had original jurisdiction. "In determining whether to retain jurisdiction over state-law claims, a district court

---

[24] For this same reason, the Village and Defendants Ball and Bennett in their official capacities are also entitled to summary judgment on each of Martin's § 1983 claims. *See Kraemer v. Luttrell*, 189 Fed. Appx. 361, 366 (6th Cir. 2006) ("Suing a municipal officer in his official capacity for a constitutional violation pursuant to 42 U.S.C. § 1983 is the same as suing the municipality itself, and thus a successful suit against a municipal officer in his official capacity must meet the requirements for municipal liability stated in [*Monell*].")

[25] As set forth *infra*, the Court also dismisses Martin's federal claim (Count VI) against Defendant Badell.

[26] As noted *supra*, the Complaint alleges two state law claims, i.e., for abuse of process (Count VII) and civil conspiracy (Count VIII). In April 2021, the parties stipulated to the dismissal of (1) Martin's abuse of process and civil conspiracy claims against Defendants Village of Roaming Shores and Ball; and (2) Martin's abuse of process claim against Defendant Bennett to the extent it is predicated on the extortion investigation. (Doc. No. 57.) In addition, as discussed *supra*, Martin abandoned his civil conspiracy claim against Defendant Bennett. Finally, complete diversity jurisdiction is lacking in this case, as both Martin and Defendant Badell are Ohio residents.

should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.'" *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  "[A] district court has broad discretion to decide whether to exercise jurisdiction over state law claims." *Smith v. Erie Cty. Sheriff's Dep't*, 603 Fed. Appx 414, 424 (6th Cir. 2015).  However, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996); *accord Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims.").

The Court declines to exercise supplemental jurisdiction over Martin's remaining state law claim against Defendant Bennett.  Martin does not dispute that his abuse of process claim (i.e., Count VII) is plead as a state law claim.  Moreover, the parties' briefing with respect to this claim depends on the interpretation and application of state law authority.   (Doc. No. 61 at pp. 5-12; Doc. No. 65 at p. 18.) The parties have not articulated any reason why the Court should exercise supplemental jurisdiction over Martin's abuse of process claim under these circumstances.  Accordingly, and upon careful consideration, the Court determines that Martin's abuse of process claim against Defendant Bennett should be adjudicated in state court.

Accordingly, the Court declines to exercise supplemental jurisdiction over Martin's remaining state law abuse of process claim and denies the Village Defendants' Motion for Summary Judgment with respect to that claim without prejudice to any right the Village Defendants may have to refile their Motion upon remand to state court.

### III.     Motion for Default Judgment against Defendant Badell (Doc. No. 52)

####      A.     Background

As noted *supra*, Martin's Complaint was filed in state court on September 16, 2019 and later removed to this Court on October 15, 2019.   (Doc. Nos. 1, 1-1.)  The docket reflects that Defendant Badell was personally served with the Summons and Complaint on November 9, 2019.  (Doc. No. 13.)  Badell has not filed an Answer or otherwise responded to the Complaint.  On March 24, 2021, Martin filed an Application for Entry of Default against Badell pursuant to Fed. R. Civ. P. 55(a), which the Clerk of Court entered the following day.  (Doc. Nos. 39, 40.)

Martin filed the instant Motion for Default Judgment pursuant to Fed. R. Civ. P. 55(b) on June 8, 2021.  (Doc. No. 52.)   Therein, Martin seeks default judgment against Defendant Badell with respect to his (1) federal claim for "private & state actor deprivation of civil rights" (Count VI); and (2) state law claims for abuse of process (Count VII) and conspiracy (Count VIII).  (*Id*. at p. 4.) Martin seeks damages in the amount of $1 million.  (*Id*. at p. 9.)  Badell has not responded to Martin's Motion.

####      B.     Legal Standard

Applications for default judgment are governed by Fed. R. Civ. P. 55(b)(2).  Under Rule 55, the clerk must enter default against a party who fails to plead or otherwise defend against a judgment for affirmative relief.  Fed. R. Civ. P. 55(a).  After the clerk enters default, the party seeking relief may apply to the court for a default judgment. Fed. R. Civ. P. 55(b).

Following the clerk's entry of default pursuant to Rule 55(a) and the party's motion for default judgment under Rule 55(b), "'the complaint's factual allegations regarding liability are taken as true, while allegations regarding the amount of damages must be proven.'"  *P&G Health & Longterm*

*Disability Plan v. Molinary*, 2019 WL 358936 at * 1 (S.D. Ohio Jan. 29, 2019) (quoting *Morisaki v. Davenport, Allen & Malone, Inc*., 2010 WL 3341566 at *1 (E.D. Cal. Aug. 23, 2010)). Specifically, this Court is required to "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Osbeck v. Golfside Auto Sales, Inc*., 2010 WL 2572713 at *4 (E.D. Mich. June. 23, 2010). To do so, the civil rules "require that the party moving for a default judgment must present some evidence of its damages." *Mill's Pride, L.P. v. W.D. Miller Enter*., 2010 WL 987167 at *1 (S.D. Ohio Mar. 12, 2010).[27]

    **C.**    **Analysis**

       **1.**    **Federal Claim (Count VI)**

In Count VI, Martin alleges that Defendant Badell "jointly participated with state officials: to wit, Defendant Bennett, Defendant Ball, and/or The Police Officer Defendants, and/or John Does 1-10, in the baseless arrest and prosecution(s) of Plaintiff." (Doc. No. 1-1 at ¶ 140.) Martin further alleges that Badell "is a private citizen who, by his entanglement and/or joint engagement and/or willful activity with the Village officials mentioned above, violated Plaintiff's right to be free from unreasonable searches and seizures as guaranteed by the Fourth and Fourteenth Amendment." (*Id*. at ¶ 141.) Martin thus alleges that Badell is a "state actor" for purposes of his federal constitutional claims. (*Id*. at ¶ 142.)

---

[27] Rule 55(b)(2) "allows but does not require the district court to conduct an evidentiary hearing" regarding damages. *Vesligaj v. Peterson*, 331 Fed. Appx. 351, 354-55 (6th Cir. 2009). An evidentiary hearing is not required if the Court can determine the amount of damages by computation from the record before it. *HICA Educ. Loan Corp. v. Jones*, 2012 WL 3579690 at *1 (N.D. Ohio Aug. 16, 2012). The Court may rely on affidavits submitted on the issue of damages. *See P&G Health & Longterm Disability Plan*, 2019 WL 358936 at * 1.

For the following reasons, the Court finds that Martin is not entitled to default judgment with respect to this claim. Martin alleges that Badell is responsible for the constitutional violations committed by Defendants Bennett and Ball because he (Badell) "jointly participated" in these violations and is, therefore, a "state actor" for purposes of 42 U.S.C. § 1983. Specifically, the Complaint alleges that "Defendant Badell and Defendant Bennett agree together to prosecute Association Board Members (including Plaintiff) in an attempt to prevent Association board members from enforcing Association rules and regulations that would require Defendant Bennett to pay dues and would require Badell to get rid of the junk in his yard." (Doc. No. 1-1 at ¶ 62.) As discussed at length above, however, the Court has found that the Village Defendants are entitled to summary judgment with respect to all of Martin's federal claims. Of particular note, the Court has found that Defendant Bennett did not make, influence, or participate in the decision to prosecute Martin and, thus, no Fourth Amendment constitutional violation occurred. In the absence of a genuine dispute of material fact that Defendant Bennett (or any of the Village Defendants) engaged in any unconstitutional behavior, Martin's claim that Badell is liable for "jointly participating" in their allegedly unconstitutional actions must also fail.

Martin's request for default judgment with respect to this claim fails for the additional reason that the only factual allegations supporting this claim are that Badell falsely accused Martin of criminal conduct because he was angry and resentful towards Martin and the RRA generally. *See* Doc. No. 1-1 at ¶¶ 59, 61, 73(a) – (c). *See also* Plaintiff's Motion for Default Judgment (Doc. No. 52) at p. 8 (arguing that Martin is entitled to default judgment because Badell "knowingly fabricated allegations against Plaintiff that were made to retaliate against Plaintiff for his efforts to stop Defendant Badell from keeping junk in his yard.")

However, the Sixth Circuit has held that "[p]roviding information to the police, responding to questions about a crime, and offering witness testimony at a criminal trial does not expose a private individual to liability for actions taken 'under color of law.'"  *Moldowan v. City of Warren*, 578 F.3d 351, 399 (6th Cir. 2009) (citing *Benavidez v. Gunnell*, 722 F.2d 615, 618 (10th Cir. 1983) ("We know of no case in which the report of a state crime is action under color of state law under § 1983.  The mere furnishing of information to police officers does not constitute joint action under color of state law which renders a private citizen liable under §§ 1983 or 1985.")  *See also Weser v. Goodson*, 965 F.3d 507, 517 (6th Cir. 2020) (finding defendant was not a state actor for purposes of § 1983 because "[e]ven if Goodson deliberately lied in her statements about Weser, that would not show that her conduct was fairly attributable to the state or that she was participating in a joint action with state agents."); *Downing v. Life Time Fitness*, 483 Fed. Appx. 12, 20 (6th Cir. 2012) ("Reporting a crime to the police does not expose a private party to liability under § 1983.")  Indeed, "[a] plaintiff may not proceed under § 1983 against a private party 'no matter how discriminatory or wrongful' the party's conduct."  *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)).

Here, the Complaint does not allege any facts suggesting that Badell did anything more than repeatedly report Martin to the police.  While Martin alleges that Badell did so because he was angry and "out to get" Martin and the RRA (and that Badell shared these sentiments with Bennett), the Complaint contains no allegations that Badell had any involvement with the Ashtabula County Prosecutor's Office decision to prosecute Martin for any of the charges at issue. [28]  Nor does Martin

---

[28] Martin submits a Declaration of his counsel, Robert DiCello, in support of his Motion for Default Judgment.  (Doc. No. 52-1.)  Therein, Mr. DiCello avers as follows: "In a follow up meeting with Defendant Badell on February 23, 2021, Defendant Badell[] admitted to a) working with Defendant Bennett to prosecute Plaintiff on charges that were brought to

allege that Badell had any personal involvement whatsoever in his arrest.  Martin does not cite any legal authority for the position that granting default judgment against a private citizen would be appropriate under these particular circumstances.[29]

Accordingly, Martin's Motion for Default Judgment against Defendant Badell with respect to Count VI is denied.  Further, because Martin's federal claim against Badell fails as a matter of law, Count VI is hereby dismissed.[30]

### 2. State Claims (Counts VII and VIII)

Martin also seeks default judgment against Badell with respect to his state law claims for abuse of process (Count VII) and conspiracy (Count VIII).  The Court declines to exercise supplemental jurisdiction over Martin's state law claims against Defendant Badell.  Martin does not dispute that both claims are plead as state law claims.  Moreover, Martin has not articulated any reason why the Court should exercise supplemental jurisdiction over his state law claims under these

---

retaliate against Plaintiff for enforcing the RomeRock Association rules against him; b) knowing about the suit and being served the complaint; c) knowing that the litigation process was on-going and discovery was underway; and d) refusing to participate in the litigation while hiding his assets through a third party in order to avoid Plaintiff's efforts to collect on any judgment entered against him."  (*Id*. at ¶ 7.)  Martin cites no legal authority for the proposition that it would be appropriate, in the context of a motion for default judgment, to consider an affidavit of his counsel as evidence outside the pleadings on an issue relating to liability, particularly where that affidavit purports to be evidence of alleged out of court statements by the defaulting defendant. Thus, the Court will not consider this paragraph of Mr. DiCello's Declaration.  Moreover, even if the Court were to consider this paragraph of Mr. DiCello's Declaration, it would not change the outcome because (as discussed above) this Court has already found that Bennett did not, in fact, make, influence or participate in the decision to prosecute Martin.  Lastly, the Court notes that the Complaint contains no allegations that Badell had any involvement in the prosecutor's office decision to arrest and/or prosecute Martin.

[29] Moreover, even assuming *arguendo* that default judgment was appropriate to liability as to this claim, Martin has failed to submit any evidence whatsoever to support his claim for $1 million in damages.  As noted *supra*, the civil rules "require that the party moving for a default judgment must present some evidence of its damages." *Mill's Pride, L.P. v. W.D. Miller Enter*., 2010 WL 987167 at *1 (S.D. Ohio Mar. 12, 2010).

[30] *See, e.g., Oliver v. Towd Point Mortgage Trust 2017*, 2021 WL 1664060 at * 2 (N.D. Ohio April 28, 2021) (*sua sponte* dismissing § 1983 claim and explaining that "even though the Towd Point Defendants have not answered or otherwise responded to the Plaintiff's Complaint, the court on its own review finds that the Complaint on its face indicates that they, too, are not state actors subject to suit for constitutional violations under § 1983.")

circumstances.  Accordingly, and upon careful consideration, the Court determines that Martin's state law claims against Defendant Badell should be adjudicated in state court.

**IV**.    **Conclusion**

For the reasons set forth above, the Village Defendants' Motion for Summary Judgment (Doc. No. 48) is GRANTED as to Plaintiff's claims under 42 U.S.C. § 1983 and state law claim for civil conspiracy; and DENIED as to Plaintiff's state law claim for abuse of process against Defendant Bennett.  Plaintiff's Motion for Default Judgment (Doc. No. 52) is DENIED and his claims against Defendant Badell under 42 U.S.C. § 1983 are DISMISSED.   The remainder of the case is REMANDED to the Court of Common Pleas of Ashtabula County, Ohio, from which it was removed.

**IT IS SO ORDERED.**

 _s/Pamela A. Barker_
PAMELA A. BARKER
Date:  March 24, 2022                              U. S. DISTRICT JUDGE

48